United States District Court
for the
Southern District of Florida

| Erika Tejeda, Plaintiff, | ) | |
|---|---|---|
| | ) | |
| v. | ) | Civil Action No. 18-23725-Civ-Scola |
| | ) | |
| Swire Properties, Inc., Defendant. | ) | |

**Order on Defendants' Motion for Summary Judgment**

Erika Tejeda seeks damages from her former employer Swire Properties, Inc., for violations of both the federal Family and Medical Leave Act as well as Florida's Civil Rights Act. (Compl., ECF No. 1-2.) She complains, in count one of her complaint, that Swire terminated her in retaliation for her request to take leave under the FMLA. And, in count two, she submits she was also, or alternatively, terminated on the basis of her national origin and gender, in violation of the FCRA. Swire has moved for summary judgment on several grounds, including (1) Tejada has failed to show that Swire's proffered reason for her termination was a cover up for FMLA retaliation; (2) Tejada failed to follow the proper administrative procedure with respect to her FCRA claims; and (3) Tejada failed to establish a prima facie case of gender or national origin discrimination under the FCRA. (Def.'s Mot., ECF No. 31.) Tejada, of course, opposes Swire's motion, arguing genuine issues of material fact presented in the record warrant a trial. (Pl.'s Resp., ECF No. 36.) Having considered the parties' briefing, the record, and the relevant legal authorities, the Court is persuaded that Swire is entitled to summary judgment with respect to Tejada's federal claim under the FMLA. For the following reasons, therefore, the Court **grants** Swire's motion, **in part** (**ECF No. 31**), and **remands** Tejada's remaining pendent state-law claims.

1. **Legal Standard**

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact

to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

## 2. Background

Swire is a property developer, which owns and operates mixed-use, principally commercial properties in South Florida. (Pl.'s Resp. at 2.) Its headquarters are in Hong Kong. (*Id.*) Tejada began working at Swire as a temporary receptionist and in April 1996 was offered a permanent position as Swire's then-president Stephen Owens's secretary. (Def.'s Stmt. of Facts at ¶ 1, ECF No. 30, 1.) Tejada was also assigned certain human resources duties and was named assistant office manager. (*Id.*) Tejada's human resources duties were supervised by Swire's human resources manager at the time, Beverly McMain. (Id. at ¶ 2.) From the time Tejada began working at Swire, in 1996, until she was terminated, in 2017, the company's Miami office grew from 24 employees to approximately 120. (Tejada Dep. 32:25–33:8, ECF No. 29-1, 33.) Owens considered Tejada to be a valuable employee. (Pl.'s Resp. at 2.)

Owens retired as president in December 2016 and McMain retired in February 2017. (Def.'s Stmt. at ¶ 2.) Kieran Bowers succeeded Owens as president, in Miami, upon Owens's retirement. (Pl.'s Resp. at 3.) Swire also hired Catterina Calderon as McMain's replacement. (Def.'s Stmt. at ¶ 6.) According to Alexa Macmullen, an accountant at Swire, Calderon "came in and changed everything." (Macmullen Dep. 12:22, ECF No. 34-2, 12.) This included changing Tejada's title to "Human Resource Generalist" and raising Tejada's annual salary by $5,000. (Def.'s Stmt. at ¶ 9.)

Almost immediately, however, according to Tejada, conflict arose between Calderon and herself as well as other Swire employees. For example, says Tejada, Calderon complained about the way Tejada dressed, wore her hair, and painted her fingernails blue. (*E.g.*, Tejada Dep. at 54:8–11; 55:16–17; 58:7–11.) Then, in late July or early August 2017, Calderon noted a number of what she perceived as Tejada's performance deficiencies in a written "Performance Improvement Plan." (Def.'s Stmt. at ¶ 13.) In the plan, Calderon complained about Tejada's shortcomings with respect to her attention to details, ownership of general responsibilities, and meeting deadlines. (*Id.* at ¶ 14.) Tejada says the evaluation was largely invalid and that, though she signed it, she disagreed with it. (Tejada Dep. at 148:1–11.) On the other hand, Tejada also concedes that at least some of the identified deficiencies had merit. In particular, Tejada admits that she submitted payroll without first getting the proper approvals as she had been instructed to do. (*Id.* at 116:14–22.)

A few weeks later, in late August, Calderon gave Tejada a second disciplinary notice, identifying additional performance issues. (Def.'s Stmt. at ¶ 19.) Although Tejada concedes that some of the errors complained of in the notice happened, she blames a malfunctioning website for one of them. (*Id.* at ¶ 20.) On the other hand, Tejada admits that she failed to provide Swire's accounting department with certain disability insurance billing documents when she was supposed to. (*Id.*)

Finally, on September 15, 2017, Tejada received, by email, a letter from an attorney representing Ashley Alba, a former Swire employee. (*Id.* at ¶ 22.) The letter set forth Alba's complaint that she was required to report to a low-level employee rather than, as she had been promised, then-vice president Efren Ales. (*Id.*) Alba also alleged that male employees had made inappropriate comments to her, necessitating the intervention of her boss. (*Id.*) The parties dispute whether Calderon told Tejada not to share the email with anyone, particularly Ales. (*Id.* at ¶ 23; Pl.'s Stmt. at ¶ 23.) And the parties also dispute whether the letter should have properly been considered confidential. (Def.'s Stmt. at ¶ 23; Pl.'s Stmt. at ¶ 23.) There is no dispute, however that Calderon did not want Tejada to share the email with Ales. (Def.'s Stmt. at ¶ 25; Ales Aff. ¶ 10, 34-7, 4 (denying that anything in the letter was confidential but acknowledging he believed Calderon did not want him to have a copy of the email because it revealed Calderon had made a mistake when hiring Alba).) There is also no dispute that once Calderon found out Tejada had forwarded the letter to Ales, Calderon immediately initiated the process of terminating Tejada. (Def.'s Stmt. at ¶ 29.) And while Tejada insists Calderon was using the letter-forwarding incident to set her up for termination, she does not dispute that Calderon took steps to fire her well before she actually requested leave. (*Id.* at ¶ 29–30.)

To be sure, the parties do not dispute that the decision to terminate Tejada was formalized in a termination notice, drafted by Swire's corporate counsel, Stephen Binhak, late on September 20, a Wednesday. (*Id.* at ¶ 30.) Tejada was out sick that day but returned to work on the 21st and 22nd. (*Id.* at ¶ 31; Tejada Aff. at ¶ 2.) Despite being at work on that Thursday and Friday, however, she was not told of the termination on either of those days. (Pl.'s Stmt. at ¶ 31.) Tejada was then out the following Monday and Tuesday (the 25th and 26th). (Def.'s Stmt. at ¶ 31.) Late that Tuesday night, though, on the 26th at 10:00 pm, Tejada emailed Calderon to say that she would be taking FMLA leave in order to care for her mother. (*Id.* at ¶ 32.) The following morning, on the 27th, Calderon met with Tejada and asked her if she had forwarded any confidential information to Swire's management team. (*Id.* at ¶ 36.) When Tejada answered, "No," Calderon told her that Tejada had broken Calderon's trust and fired her. (*Id.* at ¶¶ 37–40.)

Tejada maintains the letter was not confidential and that she had no reason to know that Calderon considered it confidential. (Pl.'s Stmt. at ¶ 38.)

### 3. Analysis

### A. Retaliatory Termination under the FMLA

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [i]n order to care for the . . . parent[] of the employee, if such . . . parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(D). "[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001). In order to demonstrate intentional discrimination, a plaintiff must "show[] that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Id.* (quotations omitted). "When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent," as in this case, courts "apply the same burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green* . . . for evaluating Title VII discrimination claims." *Strickland*, 239 F.3d at 1207. Under this framework, a plaintiff must set forth the following in order to establish a prima facie claim of retaliation: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." *Id.*

Generally, a "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). There is, however, an exception: "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Id.* Swire, here, maintains the termination decision was made before Swire ever became aware that Tejada was seeking FMLA leave. Tejada does not directly address this point. But after a review of the record, the Court finds a clear issue of material fact regarding when the ultimate termination decision itself was actually made.

Swire insists that "before September 20, 2017, Ms. Calderon made the decision to terminate Plaintiff, obtained the approval from Kieran Bowers, and contacted corporate counsel Stephan Binhak, to discuss how the termination would be handled." (Def.'s Mot. at 17.) In further support of its position, Swire

also points out that "[b]y September 20, 2017, Mr. Binhak had provided Ms. Calderon with [an] email about Ms. Tejada's employment termination and severance agreement to give [her], dated September 20, 2017." (*Id.*) In contrast, it wasn't until September 26 that Tejada, for the first time, requested FMLA leave.

There are two problems with Swire's claim that Calderon had no knowledge of Tejada's leave request before finally effecting her termination. First, Calderon did not actually fire Tejada until September 27. She testified that the delay was occasioned by Tejada's absence beginning on the 20th until the 27th. (Calderon Dep. 57:9–15, ECF No. 29-2, 57.) Tejada, however, testified by affidavit that she was in the office all day on the 21st and the 22nd. If a jury were to credit Tejada's testimony in this regard, it would not be unreasonable for it to, in turn, conclude that a final and irrevocable decision had not, in fact, been made as to her termination on the 20th. Secondly, and more importantly, Calderon herself testified that if Tejada had simply admitted, during the termination meeting on the 27th, that she had shared the email with Ales, Calderon "would've kept her." (*Calderon Dep.* at 63: 7–16.) Viewing these facts in the light most favorable to Tejada, one could reasonably conclude that some potential wiggle room remained in executing the final decision to fire Tejada by the time she sent her leave notice.[1] Based on the unique sequence of events presented by these facts, the temporal proximity between the actual implementation of the termination decision and the FMLA request, is enough, though just barely, to establish Tejada's prima facie claim of FMLA retaliation.

This, however, does not get Tejada all the way there. Once a plaintiff succeeds in setting out a prima facie case under the *McDonnell Douglas* framework, "the burden then shifts to the defendant to articulate a legitimate reason for the adverse action." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id.* Here, Swire has articulated a legitimate reason for Tejada's firing and Tejada has not come forward with material evidence showing that Swire's proffered reason was a cover up for FMLA retaliation.

"To show pretext, a plaintiff must come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* at 1298

---

[1] There is no dispute that Tejada was absent from work on September 25 and 26 (Monday and Tuesday). Thus if Calderon's testimony had been that the decision had been made on the 25th but not executed until the 27th, when Tejada returned to work, the Court's conclusion would have been a closer call.

(quotations omitted). Something more than just temporal proximity must be established in order to show pretext: for example, inconsistencies, ambiguities, or deviations from an employer's standard procedures may indicate pretext. *Id.* Importantly, however, "[a]n employer's reason for an employment decision can be 'a good reason, a bad reason, a reason based on erroneous facts, or no reason at all, as long as its action is not for a discriminatory reason.'" *Brisk v. Shoreline Found., Inc.*, 654 Fed. App'x 415, 417 (11th Cir. 2016) (quoting *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1187 (11th Cir. 1984) (alterations omitted). That is, "[p]retext is only proven if it is shown both that the reason was false, and that discrimination or retaliation was the real reason behind the challenged action." *Brisk*, 654 Fed. App'x at 417 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

    To begin with, Tejada has forfeited her ability to argue that Swire's proffered reason for her termination is mere pretext to cover up that she was really being fired in retaliation for her leave request: she does not address this point anywhere in here response to Swire's motion for summary judgment. Still, the Court must review the record to determine whether the record reveals, in any event, disputed issues of material fact on this point. And while the record reveals evidence from which a jury could infer the proffered reason was imprudent or ill-advised, the Court can discern no evidence that the proffered reason was presented in order to cover up FMLA retaliation.

    Most significantly, it is undisputed Swire had taken substantial and decisive steps towards Tejada's termination well before she announced her leave request. As previously relayed, it is undisputed that, by September 20, Calderon had spoken to Bowers about terminating Tejada, gotten his approval to do so, and contacted Binhak to discuss handling the termination. (Def.'s Mot. at 17.) In fact, late in the day on the 20th, Binhak emailed Calderon about the termination, providing her with a termination agreement, dated September 20, 2017. (*Id.*) Moreover, the record is clear that conflicts between Tejada and Calderon had arisen well in advance of Tejada's request for FMLA leave. For example, as Tejada testified, Calderon, as early as July 2017, wrote up a performance improvement plan, listing a number of complaints Calderon had about Tejada's work. (Tejada Dep. at 86:2–4.) Further, Tejada testified that almost as soon as Calderon started, in early 2017, Tejada disagreed with Calderon's methods and took issue with her leadership style, complaining Calderon was "not to be trusted, moody, changes her mind," wanted to change policies without putting them in writing, and was a "control freak." (*Id.* at 88:12–14; 92:23 ("We had many problems before this."); 99:4–5.) Tejada also complained that, early on, Calderon excluded her from important meetings and training sessions that she felt she should have attended. (*E.g., id.* at 95:1–5.)

Additionally, although Calderon might have been willing to give Tejada another chance depending on how Tejada responded to her during the termination meeting, many within the company were already aware that Tejada's termination was imminent prior to her leave request. (*E.g.*, Owens Dep. 63:6–11, ECF No. 34-1 (testifying that he met with Bowers the day before Tejada's termination and told him that he had "heard [that day] from two or three people in the office that they [thought Tejada would] be dismissed" the following day), 110:8–11 (testifying that he knew Tejada would be fired twenty-four hours in advance of her termination).) In fact, Macmullen, the Swire accountant, testified that Calderon's desire to "get rid of [Tejada]" emerged soon after Calderon started with Swire, many months before Tejada requested leave. (*E.g.*, Macmullen Dep. 12:17–20.)

On the other hand, the Court acknowledges there are indeed disputed issues of fact regarding the wisdom or propriety of the reason proffered for Tejada's termination. Such disputes alone, though, do not amount to a showing of FMLA retaliation. For example, a number of witnesses testified that they believed the document Tejada shared with Ales was not actually confidential. Their quarrel in this regard, however, does not amount to a showing that Calderon herself knew it was not confidential: pretext is not established simply by "quarreling with the wisdom" of the proffered reason. *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1274 (11th Cir. 2017). Instead, the plaintiff must come forward with "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (quotations omitted). The evidence in the record here does not rise to such a level.

And even if the record did present such evidence, Tejada is still missing a link between her termination and her FMLA request. That is, "[p]retext is only proven if it is shown both that the reason was false, *and* that discrimination or retaliation was the real reason behind the challenged action." *Brisk*, 654 Fed. App'x at 417 (emphasis added). Indeed, Ales testified he did not believe Calderon herself considered the letter necessarily confidential because she had already informed him of its contents. (Ales Aff. at ¶ 9.) However, Ales himself pointedly testified that Calderon's alleged subterfuge as to confidentiality had nothing to do with Tejada's request for leave but, instead, was motivated by Calderon's concerns that the letter might "reveal that Calderon [had] made . . . a serious error" in Alba's offer letter. (*Id.* at ¶ 10.) Indeed, Ales's testimony, even if believed, does not undercut Calderon's fundamental assertion that she fired Tejada because she shared a letter that Calderon did not want shared—whether because it was confidential or could implicate her in a hiring mistake. And while firing

Tejada in an attempt to cover up her own mistake could certainly be considered ill-advised, or flat-out wrong, it nonetheless does not amount to FMLA retaliation—especially here, in light of the sequence of events in this case. *Badger v. MCG Health, Inc.*, 546 Fed. App'x 833, 836 (11th Cir. 2013) (noting that evidence of an undeserved termination does not amount to a pretextual termination).

Further, nothing in the record undercuts Calderon's professed genuine desire that Tejada not share the letter with Ales. Calderon testified repeatedly that Tejada was fired for sending the letter, which she said was confidential, to Ales (Calderon Dep. at 41:25–42:6; 43:21–44:7; 45:11–13.) Other testimony was consistent with Calderon's: Dawn Baker, Swire's current Vice President of Human Resources, testified that Tejada's file shows she was fired, in large part, based on sharing confidential information and then lying about whether she shared it (Baker Dep. 43:20–24, ECF No. 34-4, 43); Macmullen said she heard Tejada was fired for showing a legal document to Ales (Macmullen Dep. 33:1–3); and Owens, echoed this as well, saying he heard that Tejada had shared a legal letter without approval (Owens Dep. at 53:21–22). And while Ales testified, as set forth above, that he believed Calderon knew the letter was not confidential, he nonetheless acknowledged Calderon had genuinely not wanted Tejada to share the email with him. (Ales Aff. at ¶ 10 ("Calderon was reluctant to provide me a copy of the Email . . . because [it] reveal[ed] that Calderon made what could be a serious error on her part.") What is consistent is that Calderon had not wanted Tejada to share the letter with Ales; Tejada shared it with him; and then she was fired, in large part, for sharing the letter. In sum, Tejada has not set forth any evidence that this issue was concocted as pretext to cover up for retaliation against Tejada for requesting leave. *See Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1244 (11th Cir. 2010) ("[I[t is insufficient to show merely that an employer's reasons are pretextual; rather the plaintiff must show that the reasons are a pretext *for discrimination*.") (emphasis in original).

In sum, there is nothing in the record that points to a genuine issue of material fact indicating that the plan to terminate Tejada was driven by her request for FMLA leave. And Tejada cannot rely on her eleventh-hour request for FMLA leave to shield her from the application of her termination plan, which had been set in motion at least days, if not months, earlier. *See Schaaf*, 602 F.3d at 1242 (recognizing that a deficient employee cannot protect herself from an adverse employment action by preemptively seeking FMLA leave right before being fired). Ultimately, the record reveals no genuine issue of material fact with respect to Tejada's FMLA retaliation claim, entitling Swire to a judgment in that regard as a matter of law.

### B. Preemptive Termination or FMLA Interference

Alternatively, Tejada, in her opposition to Swire's motion argues (1) Calderon knew, long before Tejada requested it, that she would need to take FMLA leave and (2) therefore, with that knowledge, interfered with her FMLA rights. In support, Tejada points to her affidavit wherein she says "Calderon knew about [her] mother's serious health conditions[] long before [she] requested leave." (Tejada Aff. at ¶ 1.) Tejada maintains she knows this to be true for three reasons: (1) Tejada had told Calderon, "on numerous occasions," about incidents where Tejada's mother had to be rushed to the hospital; (2) Calderon asked Tejada, almost daily, how her mother was doing; and (3) Calderon must have overheard coworkers asking Tejada how her mother was doing. (*Id.*) No matter how generously a factfinder views this evidence though, it is far too slender a reed to support the conclusion that Calderon was aware Tejada's request for leave would soon be forthcoming.

Additionally, to the extent Tejada seeks to recast her complaint as seeking relief for FMLA interference, rather than retaliation, her attempt fails. "[T]he FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act" and "retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Strickland*, 239 F.3d at 1206. Tejada, in her complaint, raises a retaliation claim only: "Swire terminated Plaintiff's employment and her benefits in retaliation for her attempt to exercise her right to take leave under the [FMLA]." (Compl. ¶ 24, ECF No. 1-2, 7.) "Although Rule 8's pleading standard is to be applied liberally, a defendant is not required to infer all possible claims that could arise out of the facts set forth in the complaint at the summary judgment stage." *Brisk*, 654 Fed. App'x at 417. And "[a] plaintiff may not amend a complaint through argument in a brief opposing summary judgment." *Id.* Because Tejada did not raise an interference claim in her complaint and did not seek to amend her complaint to add it, she cannot now rely on such a theory to defeat Swire's motion for summary judgment.

### C. Supplemental Jurisdiction

Having granted summary judgment in Swire's favor on Tejada's only federal claim, all that remains, then, of her complaint is her state-law claim under the FCRA. Once a court disposes of all the claims over which it had original jurisdiction, it may then, in its discretion, decline to exercise supplemental jurisdiction over claims that arise only under state law. Having evaluated this case, and noting that the only federal claim has been disposed of prior to trial,

the Court declines to exercise supplemental jurisdiction over the remaining pendent state-law claim. The Court thus remands Tejada's FCRA claim as set forth in count two to state court so that she may pursue that claim in a more appropriate forum. *See Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Murphy v. City of Aventura*, 383 Fed. App'x 915, 918–19 (11th Cir. 2010) (affirming dismissal of pendent state-law claims after granting summary judgment even where the plaintiff complained that doing so was "unfair" and "work[ed] an injustice by requiring her to begin anew in state court") (quotation alteration omitted); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("encourage[ing] district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial"); *Cotton v. Ben Hill County*, 208 F. Supp. 3d 1353, 1364 (M.D. Ga. 2016) ("While it may be convenient for the Parties to continue litigating this case in this Court, neither judicial economy nor fairness to other litigants supports retaining jurisdiction over Plaintiff's state law claims while delaying justice in other cases where the Court retains original jurisdiction."). The Court therefore **remands** Tejada's remaining claim to state court, from where it originated. *See Pace v. Peters*, 524 F. App'x 532, 538 (11th Cir. 2013) ("[B]ecause this case was originally filed in state court and removed to federal court under § 1441, the district court should have remanded [the plaintiff's] state law tort claims to the state court, rather than dismissing them with prejudice.") (citation omitted); *Lehman v. Lucom*, No. 11-23479-CIV, 2012 WL 1802435, at *7 (S.D. Fla. May 17, 2012) (Scola, J.), *aff'd*, 727 F.3d 1326 (11th Cir. 2013) (granting the defendant's motion for summary judgment on the federal claims and declining to exercise supplemental jurisdiction over the remaining state claims).

### 4. Conclusion

In conclusion, Tejada has failed to make a showing sufficient for a jury to reasonably find on her behalf with respect to her FMLA retaliation claim. And she had not pleaded an FMLA interference claim. The Court therefore **grants, in part**, Swire's motion for summary judgment with respect to Tejada's FMLA claims (**ECF No. 31**). The Court declines to exercise supplemental jurisdiction over the remaining state-law claim under the FCRA in count two, remanding it to the state court from which it originated.

The Court directs the Clerk to **close** this matter and take all necessary steps to ensure the prompt **remand** of this action and transfer this file back to the Circuit Court for the Eleventh Judicial Circuit in and for Miami-Dade County.

The Court also directs the Clerk to **remove** this case from the trial calendar. Any pending motions in this case are **denied as moot.**

**Done and ordered** at Miami, Florida, on November 6, 2019.

_____
Robert N. Scola, Jr.
United States District Judge